## THE WESTERN ASSURANCE COMPANY *vs.* THE CHESAPEAKE LIGHTERAGE AND TOWING COMPANY.

*Insurance of goods by carrier for indemnity—Double insurance—Loss
from peril of the sea—Sea-worthiness of vessel—Liability of insurer
to carrier who has paid loss—Evidence.*

The insurer is liable for a loss directly resulting from a peril of the sea in-
sured against, although the remote cause be the negligence of the crew
of the vessel.

A carrier of goods is entitled to insure the same in order to protect him-

self against a possible liability for loss, and it is not necessary that the policy should state that it is one of indemnity.

When a policy of insurance on goods. taken out by a carrier by water, is stated to be "on account of whom it concerns," and it was not intended for the benefit of the owner of the goods transported, but for the indemnity of the carrier, and the owner of the goods also has insurance thereon and a loss occurs from a peril insured against, there is not under these circumstances double insurance within the meaning of the first policy.   In such case when the carrier has paid the loss to the assignee of the owner, he is entitled to recover the same from his insurer.

When a lighter, soon after being loaded, is allowed to get adrift in the harbor, and is made to roll by the wind and the swell of a passing steamer, which causes a shifting of the cargo and the subsequent capsizing of the vessel, there is evidence from which the jury may infer that the loss was occasioned by a peril of the sea insured against and not from the unseaworthiness of the vessel, although it was permitted to ge t adrift by the negligence of the crew.

While a cargo of corn was being carried across the harbor of Baltimore in a scow belonging to  plaintiff, a towing company, the vessel was cap - sized and cargo lost.   The defendant insurance company had issued a policy to the towing company "on account of whom it concerns" on mer- chandise in the scow against all perils of the river, etc.  The owner of the corn had·previously insured the cargo in the N. A. Insurance Company which paid the amount of the loss to the owner.  A transportation company, which had contracted to carry the corn, was required to pay the amount of the loss to  the assignee of the owner of the cargo, and that company in turn collected the same from the towing company.  This ac- tion was then brought by the towing company against the defendant in- surance company.   *Held,* that evidence is admissible to  show that the owner of the cargo had been paid for its loss and to trace the payments by the different parties concerned down to the towing company.

*Held,* further, that the  towing company was responsible as a common carrier for the  loss and had a right to insure the  cargo without stating that the policy was one of indemnity only; that the prior insurance in the N. A. Insurance Company by the owner did not make the insurance in this case double insurance within the  terms of  the policy which the owner of the cargo had never adopted.

*Held,* further, that since the evidence was conflicting as to  whether the scow was seaworthy when the cargo  was loaded that question was properly left to the jury.

The amount paid by some of the parties liable for the  loss of a cargo is evidence of its value in an action against another  party also liable for the loss.

*Decided February 13th, 1907. .*

Appeal from the Court of Common Pleas, (DOBLER J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Jno. J. Donaldson* (with whom was *Daniel H. Hayne*, on the brief), for the appellant.

The first bill of exceptions was to the Court's admission of a question put to plaintiff's witness, *Hilken*, and his answer thereto. After Mr. Atkinson, who was an officer of the Elbarge Transfer Company, had testified to the payment by his company to the North German Lloyd, and by the plaintiff to the Elbarge Transfer Company. Mr. Hilken, a member of the firm, who are agents for the North German Lloyd, was called by the plaintiff and asked if his firm, as such, had paid the Insurance Company of North America the value of the corn in question. Defendant objected, but the Court overruled the objection, and allowed the witness to answer, which he did, as follows, viz: "Yes, sir; we were sued for the value of this corn, and we paid the amount." Whereupon the defendant, because this testimony was not followed up by an offer of the record of the suit under which such payment was made, excepted to the Court's ruling.

The plaintiff is claiming for the amount by it paid to The Elbarge Transfer Co. (by that company to the North German Lloyd; by the North German Lloyd to the Insurance Co. of North America, and by the last to I. M. Parr & Son, the owners of the corn), as a loss under the terms of defendant's policy. All of the payments, except that from the North German Lloyd to the Insurance Co. of North America were on mere demand without suit brought. This payment the plaintiff was not entitled to prove without showing *all* the circumstances under which it was made, viz., the record of the suit mentioned. Unless this were produced and showed that it was binding on those who successively made payment one to the other, these other payments were *merely voluntary* and could not be a loss under defendant's policy.

*The Double Insurance.* This question is raised by the de-
fendants first prayer.    As to the facts there can be no dispute.
The policy issued by the Insurance Company of North
America to I. M. Parr & Sons was nearly *twenty-two years*
"prior to date" to that here sued on.    Both covered the *goods*
themselves and not a mere interest in the same, and was on
the *full value.*

The policy issued by defendant to plaintiff was "on account
of whom it concerns."    That such a policy enures to the ben-
efit of the owner there can be no question.    That there was
accordingly a double insurance, it is submitted, is also free
from doubt.    The case would seem to be decided by this
Court's judgment in *Fire Ins. Assn.* v. *M. & M. Tr. Co.*, 66
Md. 347.

To the same effect are the decisions of the Supreme Court.
*Home Ins. Co.* v. *Warehouse Co.*, 93 U. S. 527.    In the same
line are *Hough* v. *People's Ins. Co.*, 36 Md. 398, 433; *Pacific
Mail S. S. Co.* v. *Gt. West. Ins. Co.*, 65 Barb. 334.

It would seem needless to urge that "priority in date" is
determined by *date* and not by attaching of the risk.    *Deming*
v. *Merchants' Cotton Press & Storage Co.*, 90 Tenn. 306.

It will be noted that both the policies here are on the *goods*
and the *full value* of them, thus distinguishing the case at bar
from those relied on by the defendant and the Court below,
where a carrier's policy was held not to constitute double in-
surance because *limited in terms* to the carrier's interest.    *Roy-
ster* v. *Roanake, N. & B. S. B. Co.*, 26 Fed. Rep. 492.

The validity of the "American clause" was upheld in this
Court in *Whiting* v. *Ins. Co.*, 15 Md. 297, though it was held
it did not there apply, as the sum of the several policies did
not equal the value of the ship insured.

The course of payments made in the case at bar is a com-
plete demonstration that the insurance is double.    This plain-
tiff is now seeking to make the defendant pay a sum paid by
successive stages to the first insurer, who claimed as *assignee
of the owner.*

The result would be that the last insurer would bear the

whole loss, not getting the benefit of the terms of its policy, not even getting contribution from the other (and earlier) insurer, to which the law says co-insurers are entitled without agreement. We submit that such a ruling is legally indefensible.

*The Question of Seaworthiness.* The defendant asked the Court to take the case from the jury on the ground that the uncontradicted evidence showed that the scow was unseaworthy at the time of the inception of the risk.

That such unseaworthiness is a complete defense is settled law in Maryland. *Field* v. *Ins. Co. of N. America,* 3 Md. 244, 249; *Augusta Ins. Co.* v. *Abbott,* 12 Md. 348, 376.

The only witnesses to the happening of the accident to the scow were Bennett, Short and Chase, and they are as one in saying that there was nothing unusual about the swell from the "Louise," and Chase testified that he never knew a loaded lighter adrift to be capsized from the swell made by one of the bay steamers. That there was no unusual occurrence or adequate cause appearing for the accident raises the presumption that the vessel was unseaworthy. *Watson* v. *Clark,* 1 Dow, 344; *Munro* v. *Vandam,* 1 Park, Ins. 469; *Parker* v. *Potts,* 3 Dow, 23; *R. & O. Nav. Co.* v. *Boston Mar. Ins. Co.,* 26 Fed. Rep. 596, affirmed, 136 U. S. 408; *Higgie* v. *American Lloyds,* 14 Fed. Rep. 143.

This presumption the plaintiff has given no proof to overcome.

*The Perils Insured Against.* These are "perils of the sea." By no stretch of the imagination, we respectfully submit, can the swell from a passing bay steamer, *that was never known to upset a drifting lighter before* (Chase's testimony) be magnified into one of these. JUDGE MORRIS'S opinion in transcript of record to U. S. Ct. Ct. of Appeals in case of *Nord Deutscher Lloyd* v. *Ins. Co. of North America,* at pp. 126–7, 129.

We submit that defendant's fourth prayer, that there was no legally sufficient evidence that the loss was caused by any of the perils insured against should have been granted.

*No Proof of a Loss Payable Under Terms of Poilcy.* This question is raised by defendant's seventh prayer.

The plaintiff proved the loss of the goods; that it paid the value of the same to the Elbarge Transfer Co. (which paid the North German Lloyd, and so on in reverse order to the payment by the first insurer to the owner), but offered no evidence to show that the payment by plaintiff, or any of them (except the Nord Deutscher Lloyd) was other than merely voluntary.

The production of the record in the North German Lloyd case might have shown a decree binding on plaintiff and the others, and so a loss payable under the policy. It was not produced, however, and, as far as appears in the case at bar, plaintiff's payment was made without legal liability, and can, under no circumstances, be a loss under the policy.

*Negligence of the Crew.* The Court's modification of the defendants prayer made defendant responsible for a loss caused "by reason of negligent acts of plaintiff's servants."

The Court doubtless had in mind the allowing the scow which had neither motive power nor steering gear, to get adrift. The policy does *not* insure against loss caused by *negligence* of master or crew. It is perfectly well settled, that where the policy is thus silent, negligence of crew or master if the *proximate* cause of the loss, discharges. *The Titania,* 19 Fed. Rep. 101. It is equally well settled that the underwriter is liable, where one of the perils of the sea was the *proximate* cause of loss, even though the remote cause was negligence of master or crew. *Georgia Ins. Co.* v. *Dawson,* 2 Gill, 365; *Ins. Co.* v. *Butler,* 20 Md. 54.

In other words, if a sea peril caused the loss, it is no defense to the underwriter that the ship was exposed to it by the negligence of those in charge of her. In the case at bar we have endeavored to show that the swell from the "Louise" was not a peril of the sea. It would have been no danger to the scow if she had been in tow. At most, it only became so because, without power or steering, she was allowed to get adrift. We submit that this letting her get adrift is clearly shown to have been the *proximate* cause of the loss, and hence the underwriter is discharged.

*The Payment to the North German Lloyd.* The defendant's sixth prayer relied on the provision of the policy that if it was made for the benefit of any carrier or bailee other than the assured, the defendant should not be obliged to pay any loss, and denied the right of plaintiff to recover any sums paid by plaintiff, directly or indirectly, to the North German Lloyd, a carrier or bailee of the property insured.

It is submitted that this should have been granted. The terms of the policy are too clear for discussion, and the facts are undisputed.

*Robert H. Smith* and *J. Craig McLanahan* (with whom was *Jacob France* on the brief), for the appellee.

The appellee, did not rest its case upon the presumption arising from the fact of the vessel's being seaworthy at the inception of the risk, in order to prove that she sank through a peril insured against, but actully brought in proof of a sea peril, which was a possible cause for the loss. *Dudgeon* v. *Pembroke*, 2 App. Cas. 284; *Davidson* v. *Burnand*, L. R. 4 Com. Pl. 117; *Ajoom Goolam Hosson* v. *Union Mar. Ins. Co.*, 1901, App. Cas. 362; *Anderson* v. *Morice*, L. R. 10 Com. Pl. 58; *The Xantho*, 12 App. Cas. 504; *Hamilton* v. *Pandorf*, 12 App. Cas. 518; *Bullard* v. *Roger Williams Ins. Co.*, 1 Curt. 148; *Moores* v. *Louisville Underwriters*, 14 Fed. 226; *Long Dock Mills & Elevator Co.* v. *Manheim Ins. Co.* 116 Fed. 886; *The Majestic*, 166 U. S. 375; *The Dunbritton*, 19 C. C. A. 449; *Walsh* v. *Washington Ins. Co.*, 32 N. Y. 435; *Washington Mut. Ins. Co.* v. *Reed*, 20 Ohio, 199; *McLain* v. *The British and Foreign Marine Ins. Co.*, 16 Misc. (N. Y.) 336; *Eureka Fire & Mar. Ins. Co.*, v. *Purcell*, 19 Ohio C. C. Rept. 135; *Marcy* v. *Sun Mutual Ins. Co.*, 14 La. Annual, 264; *Arnould on Insurance,* vol. 2, p. 793.

From the above cases, it will be clearly seen that the whole weight of authority is in favor of interpreting the word "extraordinary," as used by some text writers and by some cases in discussing sea-perils, as equivalent to "accidental" and not as equivalent to "unusual." This interpretation is clearly

shown in the case of *Moores* v. *the Louisville Underwriters*, (*supra*).  On page 226, the Court uses the following language: "The underwriters may be liable for loss from the ordinary action of the sea, if that ordinary action be fatal to a seaworthy vessel."  In the case of the *Washington Mutual Ins. Co.* v. *Reed* (*supra*), the Court says, "the term 'ordinary peril' is not used as of similar meaning with common or frequent peril, or peril likely to be encountered ; nor does it have any relation, so far as I have been able to discover to how great or how small the force may be, that is brought to bear, or is encountered.   The term, I think, is used rather in contradistinction to 'accident.'   The insurer does not become liable for inherent defects in the thing insured; he does not insure against wear and tear—such things as all vessels must necessarily be subjected to; does not insure against certain loss, but insures against *accidents*."   In this case the ordinary swell of a passing steamer was held to be a peril of the river for a flat-boat.

Again, in the case of *Bullard* v. *Roger Williams Insurance Co.* (*supra*) at page 150, the language of the Court is as follows:  "It has been contended by the defendant's counsel, that the law requires all vessels to be so strong as to resist the ordinary action of the sea in the voyage for which they are insured.   This is true.   It is also said, and you will judge whether it is satisfactorily shown, that a cross-sea is ordinarily expected to be met with in the Florida Gulf Stream, and that if this vessel broke down in such a sea, this is conclusive proof that she was not seaworthy for this particular voyage.  But I do not understand that the law requires vessels to be so strong as not to receive injury from any state of the winds and seas, which may ordinarily be expected in the voyage for which she is insured.   This is not what is meant by the ordinary action of the winds and sea.   In some sense, gales and heavy seas may be said to be ordinary.   They are of very frequent occurrence in some parts of the world.   A vessel going around Cape Horn in the winter scarcely fails to encounter them, but if damage is suffered by their action on the vessel or cargo, it would certainly be no defense for the un-

derwriter to say that in that voyage they almost always occur, and the vessel should have been strong enough to resist them. Gales of wind and heavy seas are not the ordinary action of the sea in the sense of the law of insurance, and when injury is suffered by a seaworthy vessel from their action on her, she is damaged by a peril within the policy."

It is also to be noted in the cases which we have cited, that the Courts have considered that it is not necessary that the plaintiff should show the exact cause of the loss, provided the vessel has been proved to be seaworthy. It is sufficient to show some peril which *might* have caused the loss.

In *Long Dock Mills and Elevator Co.* v. *Manheim Ins. Co.* (*supra*), where a canal boat which was old and in bad condition sank at a pier without any apparent cause, the Court says: "Notwithstanding her condition, however, any reasonable explanation of the loss, apart from unseaworthiness, or the probable happening of an accident leading to the result, would fully meet the burden." The Court then says that the existence of a guide pile which might have caused the injury was proved, and continues: "If the boat settled with the tide, it should I think, be inferred that the pile caused a wound which led to the sinking, and turn the decision in favor of the plaintiff." In *Marcy* v. *the Sun Mutual Insurance Co.* (*supra*), the Court says, at p. 264: "The insurance is against river risks; when then it is shown that the loss was not caused by a land but a marine peril, that the vessel was seaworthy and a possible cause of the loss is specified, the plaintiff has then done all in his power."

Did the policy taken out by the actual owners of the grain for their own benefit, and that taken out by the appellee, a common carrier, for its benefit, under the circumstances of the case, constitute double insurance upon the grain lost? (*a*) Did the appellee have an insurable interest in the cargo, distinct from that of the owners? The authorities on this point are numerous and conclusive. *Cooley's Briefs on the Law of Insurance*, vol. 1, p. 197; *Van Zile on Carriers and Bailments*, 541, *Arnould on Marine Insurance*, p. 100; *Redfield on Car-*

*riers,* 310; *Phoenix Insurance Co.* v. *Erie Transportation Co.,* 117 U. S. 312; *Fire Insurance Assn.* v. *Merchants and Miners Trans. Co.,* 66 Md. 339.

(*b*) What was the nature of the insurable interest of the appellee in this case?    Did the appellee insure for its own benefit and in order to indemnify itself against a possible liability to the owners for the loss of the grain, or did it insure as trustee for the benefit of the owners?    The answer to this question depends on whether or not the plaintiff was liable over to the owners for the loss of the goods in its charge.    If there was such liability over, the contract of insurance sued on in this case is one of indemnity and the common carrier can recover on it as such for his own benefit.    *Home Ins. Co.* v. *R. R. Co.,* 71 Minn. 296; 301; *Savage* v. *The Corn Exchange Ins. Co.,* 36 N. Y. 655, 659; *Van Natta* v. *The Mutual Security Ins. Co.,* 2 Sandf. 491.

From the moment the appellee took on board of its scow the grain which was afterwards lost, a presumption arose that, being a common carrier, it became liable to the owners of said grain as an insurer.    *Van Zile on Carriers and Bailments,* 466; *Arnould on Marine Ins.,* vol. 1, pp. 100, etc.; *Minn., St. Paul, etc., R. R. Co.* v. *Home Ins. Co.,* 64 Minn. 66; *Savage* v. *Corn Exchange Ins. Co.,* 36 N. Y. 655, 656.

The presumption of liability to the owners raised by the fact of the appellee's being a common carrier, its having received the goods and its having failed to deliver them, might have been rebutted by the appellant's showing, if he could have done so, that there was, in fact, no liability over to the owners by the appellee.    This might have been done by introducing proofs of exemptions in the bills of lading for the grain, etc.    This, however, the appellant has not, and could not do, in this case.

If the appellant succeeded in rebutting the presumption of the appellee's liability to the owners, the appellee's insurance policy now in suit would have been merely for the benefit of the owners, and whatever the appellee might have recovered, it would then be bound to hold merely as trustee for the owners.    This was so in the *Fire Ins. Ass'n* v. *Merchants' and*

*Miners' Trans. Co.*, 66 Md. 339, and in the *Home Ins. Co.* v. *The Baltimore Warehouse Co.*, 93 U. S. 527, two cases greatly relied upon by the appellant in the Court below. In neither of these cases was there any liability over by the bailees to the owners of the goods which had been put in their hands. If such were the case here, there could, of course, be no question that the policy sued on constituted double insurance with the policy issued to the owners of the grain.

The appellant, at the trial below, contended that the policy sued on in this case could not be one of indemnity to the appellee, as it was taken upon the cargo and did not state upon its face that it was an indemnity policy. The following authorities clearly show that this contention of the appellant was incorrect. *Crowley* v. *Cohn*, 3 Barn & Ad. 478; *Home Ins. Co.* v. *R. R. Co.*, 71 Minn. 296, 301; *Phœnix Ins. Co.* v. *Erie Trans. Co.*, 117 U. S. 312.

These cases show that the Courts have looked into the actual character of the policies and not at the mere statements upon their faces, when determining as to whether they should be considered as policies of indemnity to the carrier or not.

(*c.*) Do the two policies in question in this case, namely the one sued on in this action and the one taken out by I. M. Parr & Sons with the Insurance Co. of North America, constitute double insurance on the cargo, or is the policy sued on in this action in the nature of a reinsurance of the appellee's liability as common carrier, with which the owners of the cargo and their insurance company had nothing to do? If the contract of insurance sued upon in this case was one of indemnity to protect the appellee, a common carrier, on its liability to the owners of goods entrusted to its care as an insurer at the common law, this contract comes practically within the definition of a contract of reinsurance. *Phœnix Ins. Co.* v. *Erie Trans. Co.*, 117 U. S. 312, 323; *Arnould on Marine Ins.*, vol. 1, pp. 100 to 104.

Reinsurance is defined by this author at page 102, as "a contract of insurance by which the original insurer becomes himself assured in respect of the same subject upon the

risks and under the same conditions as are expressed in the original policy."

It is to be noted that the fact of a policy's being a reinsurance need not be stated upon its face and need not be communicated even to the second underwriter.   This is the rule as stated in *McArthur on Marine Insurance*, 332.

If the policy of the appellee in this case is a policy of reinsurance, no question of double insurance on the cargo can arise.   *Arnould on Marine Insurance*, vol. 1, pp. 103 and 104; 3 *Kent Commentaries*, sec. 4, p. 278; *Ocean Steamship Co.* v. *Ætna Insurance Co.*, 121 Fed. 882, p. 887; *Angell on Fire Insurance*, sec. 83, and sec. 88; *Joyce on Insurance*, vol. 3, sec. 2467.

The original assured, namely, I. M. Parr & Sons, could have no kind of claim against the reinsurer, namely the appellant in this case.   If this be so, certainly the insurance company of I. M. Parr & Sons, namely the Insurance Company of North America, which was merely subrogated to the rights of I. M. Parr & Sons could certainly acquire no other rights than those held by them, and could have no kind of claim against the appellant in this case.   This was specifically decided by this Court on the former appeal.   99 Md. 446.

If, then, the policies of the two insurance companies had nothing to do with each other, and there could be no claim of contribution as between the companies, certainly the two policies do not constitute double insurance.

The policy in this case contains a clause insuring against loss by reason of the "barratry of the master and mariners and all other perils, losses or misfortunes occasioned by perils of the sea, etc."   But, whether the barratry clause is present or not, it is well settled, both in England and the United States, that negligence of the master and crew is not a defense for the underwriter in a marine policy of insurance, and does not exclude the assured from recovering under the policy. *Parsons on Maritime Law*, vol. 2, p. 140; *Arnould on Marine Ins.*, vol. 2, pp. 771, 772; *Waters* v. *Merchant's Louisville Ins. Co.*, 11 Peters, 213; *Columbian Ins. Co.* v. *Lawrence*, 10 Peters,

517; *Phoenix Ins. Co.* v. *Erie Trans. Co.*, 117 U. S. 312; *Georgia Ins. Co.* v. *Dawson*, 2 Gill, 365; *General Mut. Ins. Co.* v. *Sherwood*, 14 How. 351; *Busk* v. *Royal Exchange Assn.*, 2 B. and Ald. 73; *Walker* v. *Maitland*, 5 B. and Ald. 171.

BOYD, J., delivered the opinion of the Court.

This is an appeal from a judgment rendered against the appellant, in favor of the appellee, on a policy of marine insurance on a cargo of corn. The case was previously before this Court on the appeal of the Towing Company, when the judgment was reversed and a new trial awarded. *Towing Co.* v. *Assurance Co.*, 99 Md. 433. Originally the declaration contained the common counts and a special count on the insurance policy, numbered 7. Before the second trial a new seventh and an eighth count were filed. The seventh alleges that the plaintiff (appellee) was engaged in the business of carrying merchandise on scows in the port of Baltimore and procured from the defendant (appellant) insurance on twenty-seven scows for the period of a year from May 15th, 1899; that on the 29th of July, 1899, while the policy was in force, the plaintiff received on board of one of the scows included in the policy (scow 154) about 6144 bushels of corn which was to be carried from Canton Elevator No. 1 to the steamship "H. H. Meier," lying at Locust Point, and after the corn was laden on said scow, it was by reason of the perils insured against overturned and the corn lost. It is then alleged that the Insurance Company of North America, as assignee of I. M. Parr & Sons, recovered of the North German Lloyd Steamship Company, which owned the "H. H. Meier," and had contracted with I. M. Parr & Sons to carry the corn from Baltimore to Bremen, the value of the corn, under a decree of the United States District Court; that the Elbarge Transfer Company which had contracted with the North German Lloyd Company to carry the corn from the elevator to the steamship was required to pay the North German Lloyd Company the value of the corn, and that the plaintiff, which had contracted with the Elbarge Transfer Company to carry

the corn, was required on account of said decree to pay that company the sum of $2,500. The amount of the insurance on merchandise on this scow of the appellee was $2,000 and it sued for that amount, with interest. The eighth count is the same in substance as the seventh, excepting it does not refer to the decree of the United States Court. In addition to the general issue pleas, the defendant filed three special pleas to the seventh and eighth counts which are numbered 3, 4 and 5. The third alleged that "the loss in said seventh count of said declaration mentioned" did not occur by reason of any of the adventures or perils in said policy of insurance mentioned and insured against, but by reason of the unseaworthiness of the said scow, which existed at the commencement of the risk and continued to the time of the loss; the fourth alleged that at the time of the loss the plaintiff had no insurable interest in the goods mentioned; and the fifth alleged that at the time of the loss the scow was not in the service of the plaintiff but had been hired to the Elbarge Transfer Company, which at the time was carrying the goods and the plaintiff was not responsible for the safe carriage of them and the loss is not such as is payable under the policy. The trial resulted in a verdict for the plaintiff of $2,500—being the amount of the insurance, with interest allowed by the jury.

1. There are two bills of exceptions in the record—the first presenting the ruling of the lower Court on a question of evidence and the second embracing the rulings on the prayers. Mr. Hilken, a member of the firm of A. Schumacher and Company, agents for the North German Lloyd, was asked whether his firm paid to the Insurance Company of North America the value of this corn, to which he replied; "Yes sir, we were sued for the value of this corn, and we paid the amount." We see no valid objection to the admission of that evidence. The record states it was objected to "because this testimony was not followed up by an offer of the record of the suit under which such payment was made." It is said on behalf of the appellant that unless the record was "produced and showed that it was binding on those who successively made

payment one to the other, these other payments were merely
voluntary and could not be a loss under defendant's policy,"
but manifestly this was not correct. In the first place the
record of the suit of the Insurance Company of North Amer-
ica against the North German Lloyd would not necessarily
show that the plantiff was bound by the decree in the admir-
altv proceeding, as it was not necessary for it to be a party of
record. But regardless of that, the Court could not control
the order in which the plaintiff offered its proof. "A party
cannot offer all his evidence at the same moment; and when
he tenders evidence legal and material to the issue, it is the
duty of the Court to receive it, and it cannot require him to
state in advance what other proof he intends to offer."
*Patterson* v. *Crowther* 70 Md. 132. The payment of the
money was one of the issues made by the pleadings, and in
the eighth count, as we have seen, the decree was not men-
tioned, although it was alleged that the North German Lloyd
Company had paid the value of the corn to the Insurance
Company of North America, which was subrogated to the
rights of the owner. But inasmuch as by the defendant's
ninth prayer the jury was instructed that there was no legally
sufficient evidence that the plaintiff had paid any sum of money
on account of the decree, and therefore the plaintiff was not
entitled to recover under the seventh count of the declaration,
it is not perceived how the defendant could have been injured
because the plaintiff did not offer to follow up the testimony
of Mr. Hilken by introducing the record of that suit, especially
as we said in the former appeal that "any recovery from the
appéllee (the assurance company) by the appellant would not
be on the theory of reimbursing the latter for what it would
have to pay as the result of the decree in the admiralty pro-
ceedings—there was no remedy over against the appellee by
reason of that suit, but if liable at all it was on the contract of
insurance." It was proper to prove that the owners of the
corn had been paid for its loss and to trace the payments to
the Towing Company, and the question objected to was one
of the links of evidence on that subject.

2. In passing on the prayers we will follow the order adopted at the argument by the appellant and will now consider its first prayer which raises the question as to whether there was double insurance. It was to the effect that inasmuch as the corn was covered by a policy of insurance issued by the Insurance Company of North America to I. M. Parr & Sons, and said policy was prior in date to that sued on in this case, and that company paid the owners of the corn its full value, therefore under the terms and conditions of this policy the plaintiff was not entitled to recover, under the pleadings.

This policy was issued "To Chesapeake Lighterage and Towing Co., on account of whom it concerns," and it is contended that as such a policy enures to the benefit of the owner there was double insurance. The clause in reference to other insurance is : "That if the said assured shall have made any other insurance upon the property aforesaid, prior in day of date to this policy, then the said Western Assurance Company shall be answerable only for so much as the amount of such prior insurance may be deficient towards fully covering the property insured ;" etc. The appellant relies on the case of *Fire Insurance Association* v. *Merchants' and Miners' Trans. Co.*, 66 Md. 339, as conclusive of the question, but we do not so regard it. The Transportation Company had stored cotton in the freight sheds of a railway company, awaiting vessels to carry it on to its destination and insured it against loss by fire. A fire occurred which destroyed or injured a large part of it. It was shown that by the terms of the bill of lading under which the Transportation Company received the cotton, it was expressly exempted "from loss by fire, from any cause on land or water," and, as was said in the opinion, "consequently they were not liable over to the owners for this loss." Before that suit was brought all charges and expenses due the Transportation Company had been paid and it had no interest of its own in the cotton, except to the extent of those charges and expenses. This Court held that the insurance of the Transportation Company "for account of whom it may con

cern" enabled it to recover the money for the benefit of the owners of the cotton, upon their adoption of the insurance, and said "that extrinsic evidence may be adduced to show who was in fact the party concerned, and any one having title to the property at the time of loss may, *by adoption* of the contract, avail himself of its advantages, provided it be shown that his interest was within the contemplation of the party procuring the insurance." That being an insurance against loss or damage by fire, and the Transportation Company not being liable for loss by fire, and not owning any of the cotton, the Court said it would be difficult to believe that the Transportation Company would have insured the cotton to an amount not exceeding $50,000, "for account of whom it may concern," without intending to protect thereby the interest of the owners, and held that there was sufficient evidence to warrant a jury in finding such intent. The Court also found that there was enough in the record to authorize the lower Court to submit to the jury the question of the adoption of the policy by the owners of the cotton. It will thus be seen that the facts of that case differ radically from those in the one now being considered, for here the Towing Company *was responsible*, as a common carrier, for the loss of the corn, and there is no evidence whatever to show that I. M. Parr & Sons ever adopted this policy of insurance, or made any claim to it, or that it was "within the contemplation of the party procuring the insurance" that any owner of the property was to receive the insurance while the appellee was itself liable as a common carrier.

There can be no doubt that the appellee had an insurable interest in the corn for its own benefit—in order to indemnify itself against a possible liability for loss, as a common carrier. In *Phœnix Ins. Co.* v. *Erie Trans. Co.*, 117 U. S. 312, it was said "a common carrier, a warehouseman or a wharfinger, whether liable by law or custom to the same extent as an insurer or only for his own negligence, may, in order to protect himself against his own responsibility, as well as to secure his lien, cause the goods in his custody to be insured to their full

value, and the policy need not specify the nature of his interest." See also *Crowley* v. *Cohn*, 3 Barn. & Ad. 478; *Home Ins. Co.* v. *R. R. Co.*, 71 Minn. 296; *Savage* v. *Corn Exchange Ins. Co.*, 36 N. Y. 655; 19 *Am. & Eng. Ency. of Law*, 946. The cases show that it is not necessary for the policy to state that it was one of indemnity, and there is no reason why it should under such circumstances as we have before us. It was issued to a common carrier, covered merchandise while on board twenty-seven scows and was confined to the waters of the harbor of Baltimore and the Patapsco River and its tributaries. The Towing Company was named as assured, and the appellant must have known that it was a carrier. There is nothing in the record to show or suggest that any officer or agent of the appellee knew that I. M. Parr & Sons had insured this corn, and if the theory of the appellant be correct, that the prior insurance taken out by them defeats a recovery on this policy it might do great injustice to the appellee or others similarly situated. Such a doctrine might prevent a carrier from protecting itself by insurance in many, perhaps most, instances, or at least make its protection dependent on the mere fact whether the owners of goods carried by it had taken out prior insurance, which sometimes could not be easily ascertained before the shipment began. The circumstances of this case all point to the intention, on the part of assured and insurer, that this policy was primarily to protect the appellee and, in the absence of evidence to show that the owners of the corn were in fact the parties "concerned," and, as such, had by adoption of the contract availed themselves of its advantages, and that their interest was within the contemplation of the party procuring the insurance, it seems clear that the appellant's first prayer was properly rejected, as there was not double insurance within the meaning of the policy, under the facts in this case.

By its second prayer the appellant asked that the jury be instructed to render a verdict for the defendant, because "by the uncontradicted evidence in this case the lighter in which the grain mentioned in the evidence was loaded was unsea-

worthy at the time of the alleged inception of the risk under the policy sued on in this action." The Court rejected that prayer and submitted the question to the jury, as to whether the scow was seaworthy, and in doing so, there was, in our opinion, no error. The uncontradicted evidence did not show that the scow was unseaworthy, but on the contrary there was considerable testimony to show that she was seaworthy. The superintendent of construction and repairs of appellee's scows testified that the time of the accident "the scow was in perfect order as far as a scow of her age could be." The manager for plaintiff said that she met with an accident the fall before the loss of the corn and "after these repairs she was in first class condition," and other witnesses testified to the same effect. The Captain of the scow at the time of the accident said "she was perfectly in good order; perfectly dry, no water in her." The day before she had carried a load from the elevator at Canton to the H. H. Meier at Locust Point, the unloading of which was not finished until half past ten or eleven o'clock at night. The next morning she was towed over to Canton for another load and her captain and mate testified that "she was all right." After she was loaded she was pulled out to make room for another scow and when at the end of the wharf the line slipped from the bitt, when she got away and drifted out into the stream. No one was aboard of her then but the Captain called a tug which took him to her and he got aboard of her. The mate testified that "when Bennett (the captain) got aboard her she was rolling; this was caused by the passing of the steamboat 'Louise' * * * as the 'Louise' passed her, the scow was lying broadside to her, drifting up town; the swell from the 'Louise' struck her broadside and started her to rolling; witness noticed her until she went over." He also said "it was a pretty fair morning with right smart easterly wind." His evidence, as well as that of others tended to show that the rolling produced by the swell of the "Louise" and the easterly wind caused the corn to shift, thereby upsetting the scow. So without quoting further from the testimony there was evidence

which tended to show that she did not sink by reason of her being unseaworthy. It is true there was some from which it could be fairly argued that she was not seaworthy, but it was a question for the jury. In *Field* v. *Ins. Co. of North America*, 3 Md. 244, our predecessors had occasion to consider the question. In that case there was no direct proof of the seaworthiness of the vessel and no proof of stress of weather but the goods were found saturated with water and seriously damaged. The court below granted a prayer that the plaintiffs were not entitled to recover "because they had offered no testimony of any loss by perils of the sea within the terms of the policy," but our predecessors held that it was error and reversed the judgment. LeGrand. C. J., after fully recognizing the law to be that "if the vessel spring-a-leak, or becomes disabled, or some essential defect is discovered soon after the risk commences, without any apparent cause, from the perils within the policy, or rather when it satisfactorily appears that no accident can have happened to occasion the damage or defect, it is inferred she was defective at the beginning of the risk, and not seaworthy," said: "In the present case the prayer assumes that the damage was occasioned by a leak to be ascribed to the defectiveness of the vessel, and to no other cause. The jury would probably have found the fact to be as assumed by the prayers, but the Court erred in taking that question from their consideration. The presumption of law is that the vessel was seaworthy. Whether the evidence removed that presumption was for the jury and not for the Court." In this case where there was an attempted explanation of the cause of the accident, which, if believed by the jury, would have justified it in finding that it was not because the scow was unseaworthy, there was no error in the lower Court refusing to withdraw the question from the jury.

The defendant's third prayer was also properly refused. It asked the Court to say that as it appeared from the uncontradicted evidence that the loss was occasioned by the capsizing of the lighter without any unusual occurrence to account for the same the presumption was that the lighter was unsea-

worthy, "and inasmuch as the plaintiff has offered no evidence to rebut this presumption, it is not entitled to recover under the pleadings in this action." From what we have already said, it will be seen that there was, in our opinion, some evidence tending to show that the accident was caused by the rolling of the scow (produced by the wind and the swell made by the Louise) and the consequent shifting of the corn while the scow was adrift which caused it to upset, and this prayer was properly rejected.

The defendant's fourth prayer asked the Court to instruct the jury that the plaintiff had "offered no legally sufficient evidence that the loss of the grain mentioned was caused by reason of any of the perils insured against by the policy sued on in this action," etc. The adventures and perils which the defendant assumed were "of the seas, lakes, rivers, canals, railroad, fires, jettisons, barratry of the master and mariners, and all other perils, losses and misfortunes, occasioned by perils of the sea, that have or shall come to the hurt, detriment or damage of the said goods and merchandise, or any part thereof." There can be no doubt that the actual loss of the corn was sustained by reason of the capsizing of the scow —the only question being as to what occasioned that. In *Merchants Mutual Ins. Co.* v. *Butler*, 20 Md. 41, BARTOL, J., quoted with approval from *Parson's Treatise on Maritime Law*, as follows: "It is now, however settled, both in England and in this country, that if the loss is caused by a peril insured against, the underwriters are liable, although the remote cause be the negligence of the master and crew, and that whether barratry be insured against or not." If, therefore, the scow was permitted to drift by reason of the negligence of the crew and there was evidence from which the jury could find that the accident was not caused by its unseaworthiness, this prayer was undoubtedly properly rejected. It is, therefore, unnecessary for us, after what we have said above, to further discuss it or the modification of the fifth prayer.

The sixth relied on a provision in the policy, that in case the insurance is made for the benefit of a carrier or bailee of

the property assured, other than the person named as assured, the company should not be bound to pay any loss, and asked the Court to instruct the jury that the plaintiff was not entitled to recover any amount by it paid to the North German Lloyd or to the Elbarge Company on account of the loss of the grain, as it appeared by the uncontradicted evidence that the North German Lloyd was a common carrier or bailee of said property. There was no liability on this policy to either of those companies, but it does not follow that the appellee could not recover for insurance taken out to indemnify itself against loss. After what we have already said in discussing the first prayer we do not deem it necessary to say more concerning this. It was properly rejected.

The seventh asked the Court to say there was no legally sufficient evidence of any loss payable by the defendant under the terms of its policy, and therefore the plaintiff, under the pleadings was not entitled to recover. The facts proven in the case show that the appellee was liable as carrier to the Elbarge Transfer Company and that it had paid that company for the corn. The appellant offered in evidence the account which was presented to the Insurance Company of North America by I. M. Parr & Sons, the receipt of that firm to the Insurance Company for the amount and the policy under which it was paid. The account was for "mixed corn lost in transit on scow 154 between elevator and S. S. 'H. H. Meier,'" was dated July 29th, 1899, the date of this loss, and gave the number of bushels and price per bushel together with elevator charges and inspection amounting in all to $2,290.47. Those papers were doubtless offered by the appellant as reflecting upon its defense of double insurance, but they were in evidence for what they were worth and furnished some evidence of the amount of the loss for the corn even if the plaintiff's evidence had been deficient in respect to that. The evidence shows that the corn was a total loss and there being nothing shown which would exempt the carrier, we cannot understand upon what principle this prayer could have been granted. The eighth prayer was not pressed in this Court, but we might add that there was ev-

idence that the plaintiff undertook to carry the grain, and hence it could not have been granted.

In discussing the defendant's prayers we have sufficiently considered the questions presented by those offered by the plaintiff, and granted by the Court, to relieve us of any discussion of them. It is only necessary to say that we find no reversible error in them.

> *Judgment affirmed, the appellant to pay the costs.*